# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

TRICIA MIKE o/b/o G.R.,

                 **Plaintiff,**

-vs-                                     **Case No.  6:07-cv-499-Orl-DAB**

**MICHAEL J. ASTRUE, Commissioner of
Social Security,**

                 **Defendant.**

_____

## MEMORANDUM OPINION & ORDER

On behalf of her daughter, Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying the claim for Supplemental Security Income (SSI) under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case[1].

For the reasons that follow, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED**.

### I. BACKGROUND

**A.       Procedural History**

On June 10, 2002, an application for childhood Supplemental Security Income (SSI) was protectively filed for the minor child, G.R. (the "Child").  R. 53-59.  Plaintiff, Tricia Mike, is the

_____

[1]Although Plaintiff requested oral argument, the Court found such argument to be unnecessary in light of the reversal of the Commissioner's decision based on the parties' briefs.

Child's mother who is pursuing this appeal, alleging that the Child was disabled due to borderline intellectual functioning, mixed receptive-expressive language disorder (R. 21), a learning disorder, and a psychotic disorder (R. 24), specifically paranoid schizophrenia.  R. 6.  Plaintiff's claim was denied initially and upon reconsideration.  R. 30-31, 37-39.  On May 4, 2004, the Plaintiff timely requested a hearing before Administrative Law Judge, Edward Bayouth Babilonia[2] (hereinafter referred to as "ALJ") which was held on August 16, 2005. R. 312-47[3].  In a decision issued more than **one year later**, on August 25, 2006, the ALJ found the Child not disabled as defined under the Act.  R. 9-20.  Plaintiff filed a Request for Review of Hearing Decision/Order, which the Appeals Council denied on January 17, 2007.  R. 1-6.  Plaintiff filed this action for judicial review on March 23, 2007.  Doc. No. 1.

### B.    Medical History and Findings Summary

At the time of the hearing, the Child was eleven years old, going into fifth grade.  R. 65, 317, 347.  The Child's mother dropped out of school in seventh grade where she was in special education classes and she cannot read or write (other than her name).  R. 60, 235.  The Child's mother is on disability for a heart problem.  R.315.  Three of the Child's older brothers are also learning disabled (R. 235) and two were on disability at the time of her hearing.  R. 316.  The ALJ was apparently disturbed by this fact and commented on it in his decision (R. 13) and at the hearing:  "What are the reasons you feel your daughter is disabled?  You have two children already on disability.  You're on disability.  So I think your frame of mind is that all of your children [should] be on disability, ma'am?"  R. 320.

---

[2]The Record contains an apparent mistake in that the hearing transcript reflects that it was presided over by "ALJ Edward Greer" (R. 313) yet the Decision was signed by "ALJ Edward Bayouth Babilonia" (R. 20).  If a new or different ALJ did render the decision, he should have held a new hearing and made all credibility decisions *de novo*.

[3]The SSA did a lamentable job assembling this portion of the Record, with numerous pages out of order. *See* R. 312-47.

The Child's medical history is set forth in some detail in the ALJ's decision.  By way of summary, the Child was treated for paranoid schizophrenia and, beginning in second grade, was placed in special education for a learning disability.  Schizophrenia runs in her family; her maternal aunt was diagnosed with it.  R. 235.

After reviewing the Child's medical records and the testimony of the Child and her mother (Plaintiff), the ALJ found that the Child never engaged in substantial gainful activity. R. 12, Finding 2.  The ALJ found the Child suffered from a psychotic disorder, a "severe" medically determinable impairment, but not an impairment severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 12, Findings 3, 4.  The ALJ further found that the statements concerning the intensity, persistence and limiting effects of the child's symptoms were not entirely credible.  R. 13.

The ALJ found that the evidence established the following functional limitations from the Child's impairments and reasonably related symptoms: less than marked limitations in the domain of acquiring and using information (R. 14); less than marked limitation of functioning in the domain of attending and completing tasks (R. 15); less than marked limitations in the domain of interacting and relating with others (R. 16); no limitations in the domain of moving about and manipulating objects; no limitation in the domain of caring for herself (R. 18); and no limitation in the domain of health and physical well-being.  R. 19.  Based on the lack of any marked or extreme limitations, the ALJ determined that the Child had not been under a disability at any time through the date of the decision. R. 19, Finding 6.

Plaintiff asserts that the ALJ erred in finding the Child did not have marked or extreme limitations in certain domains, and therefore, did not meet the functional equivalent of a medical listing. For the reasons that follow, the Commissioner's decision is **REVERSED** and **REMANDED**.

## *II. STANDARD OF DISABILITY AND STANDARD OF REVIEW*

In order for an individual under the age of eighteen to be entitled to Supplemental Security Income payments, the Child must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906. The rules[4] follow the three-step sequential evaluation, under which SSA will consider: (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. 20 C.F.R. § 416.924.

Whether a child meets the "listing-level severity" standard is dependent upon whether the child has "marked" limitations in two broad areas of development or functioning or "extreme" limitation in one of those areas. 20 C.F.R. § 416.926a(d). Under the regulations for children, there are six domains used to determine a child's functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a. In assessing whether the Child has "marked" or "extreme" limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe, as well as the interactive and cumulative effects of the child's

---

[4]On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("the 1996 Act"), which amended the statutory standard for children seeking SSI benefits based on disability such that a child seeking SSI benefits based on disability will be found disabled if he or she has a medically determinable impairment "which results in marked and severe functional limitations," and which meets the statutory duration requirement. *Brawdy v. Barnhart*, No. Civ.A. SA01-CA-0835F, 2003 WL 1955839, at *3-4 (W.D. Tex. Mar. 27, 2003) (internal citations omitted). The final rules became effective on January 2, 2001. *Id.*

impairment or combination of impairments individually in each domain.  20 C.F.R. § 416.926a(c).

A marked limitation "seriously interferes" with the ability to independently initiate, sustain, or

complete activities.  20 C.F.R. § 416.926a(e)(2).  An "extreme" limitation is one that interferes very

seriously with a child's ability to independently initiate, sustain or complete activities. 20 C.F.R.

§ 416.926a(e)(3).

 The scope of this Court's review is limited to determining whether the ALJ applied the correct

legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings

are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial

evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact

to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal

quotations omitted).

 The court must view the record as a whole, taking into account evidence favorable as well as

unfavorable to the SSA's decision.  *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987).  Even if

the court finds that the evidence weighs against the SSA's decision, the court must affirm if the

decision is supported by substantial evidence.  *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981);

*see also Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990); *Harwell v. Heckler*, 735 F.2d 1292,

1293 (11th Cir. 1984).  The court may not reweigh the evidence or substitute its own judgment, even

if the court finds that the weight of the evidence is against the SSA's decision. *Strickland v. Harris*,

615 F.2d 1103, 1106 (5th Cir. 1980).  While there is a presumption in favor of the SSA's findings of

fact, no such presumption attaches to the ALJ's legal conclusions.  *Welch v. Bowen*, 854 F.2d 436,

438 (11th Cir. 1988); *Walker*, 826 F.2d at 999.

### III.  ANALYSIS

The Plaintiff argues that the ALJ erred by finding the Child's did not have marked or extreme limitations in certain domains or in the areas of social functioning, personal attainment, and concentration, persistence and pace, and thus did not meet the functional equivalent of a medical listing.  Although Plaintiff's analysis is somewhat vague about which domains she feels were wrongly decided, Plaintiff does not appear to dispute the ALJ's findings of no limitation in the Child's domains of moving about and manipulating objects, and caring for herself.

Plaintiff basically contends that the medical records and testimony support marked limitations in three domains:  1) acquiring and using information, 2) attending and completing tasks, and 3) interacting and relating with others and/or health and physical well-being.  The Commissioner contends that the ALJ's finding that the Child did not have a marked or extreme functional limitation in any of the six functional domains is supported by the evidence.

### A.  The Domains of Acquiring and Using Information and Completing Tasks

The Plaintiff argues that the ALJ erred by finding the Child's did not have marked or extreme limitations due to deficiencies in her skills at personal attainment, and concentration, persistence and pace; these skill sets fall into the domains of "acquiring and using information" and "attending and completing tasks."

The "acquiring and using information" domain evaluates how well a child learns information and how well she uses the learned information. See 20 C.F.R. § 416.926a(g).  The "attending and completing tasks" domain evaluates how well a child is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the pace at which she performs activities and the ease of changing activities. See 20 C.F.R. § 416.926a(h).

The Social Security Regulations specifically provide the following guidance on the domains of acquiring and using information and attending and completing tasks for school-aged children:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; *e.g.*, by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will need to use these skills in daily living situations at home and in the community (*e.g.*, reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others. . . .

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (*e.g.*, be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. §§ 416.926a(g)(2)(iv) & (h)(2)(iv).

For the domain of attending and completing tasks, the ALJ found the Child had less than marked limitations in this domain based on a questionnaire from the Child's third grade special education teacher (though it is unclear which third grade experience is being referred to). R. 16. The ALJ also quoted other reports that the Child "tries hard and is able to work independently" and "finished her work on time," but noted that the Child had an obvious limitation of remembering multi-step instructions, as noted by her teacher. R. 16 (citing R. 138). The ALJ cited testimony from Plaintiff that the Child was well behaved and liked to watch television (it is not clear to the Court how this is anything more than a passive activity rather than a "task"), and play with game boards, and did

her homework as needed; she used computers in school and was good at Play Station games.  R. 16.

For the domain of acquiring and using information, the ALJ found the Child had less than marked limitations in this domain because "they do not seriously interfere with her ability to learn and perform at school."  R. 15.  The ALJ acknowledged that the Child performs below the grade level norm, but according to her third grade special education teacher (though he did not indicate whether it was the first or second time the Child was in third grade), she performs equal to other students in her learning disabled special education class.  R. 14.  The ALJ cited a report from March 2002 (three years **prior** to the hearing) that reported the Child was reading at a second grade level when in second grade and she was able to write simple sentences and paragraphs; she was at a second grade level in math at the beginning of third grade.  R. 14.  The ALJ also cited the Child's grades of A, B, and C as "no indication she is having significant problems acquiring and using information."  R. 14.  Further evidence on which the ALJ relied  was the Child was "very good at games on PlayStation" and that "she did not hear voices at school."  R. 15.

Although the ALJ acknowledged in passing that the Child was in special education classes and had failed third grade because she was a full year behind (R. 15), he detailed none of the reports that Volusia County Schools had performed that placed the Child in special education and failed to discuss the Child's specific and abysmal results on the Florida Comprehensive Achievement Test (FCAT) score that led to the Child's failing third grade.  The ALJ stated only that the FCAT results indicate "she was below level in reading and math," without further elaboration, and then cited a 2005 "report" (actually a compulsory IEP required for all special education students) which indicated to the ALJ that

"the Child's progress is sufficient to enable her to reach the annual goals by the end of the year[5]."  R. 15.

In his decision, the ALJ omitted or ignored the fact the "Report" he cited was not from her second grade year, but from January 2005 – three years after the Child had finished second grade – in which testing showed she was still reading at a **second grade** level and doing math at a **beginning third grade level** – two full years behind her peers.  R. 174. The Child's third grade teach indicated that she was a beginning second grade level in reading and math (R. 188); thus, in the ensuing two years, she had not made a great deal of progress.  The same 2005 "report" or IEP cited by the ALJ, based on the Child's teachers' assessments, also noted that the Child had "a lot of reading errors when doing homework on her own.  Though she tries hard, Language Arts is very hard for [her]."  R. 174. The IEP further noted, "As a result of the student's exceptionality, involvement and *progress in the general education curriculum is limited in all subject areas.*" R. 174 (emphasis added)

Although the Commissioner acknowledges that "good performance in a special education class does not, in itself, establish that a child is functioning at the same level as other children, who do not have impairments, 20 C.F.R. § 416.924a(b)(7)(iv), [the Child's] difficulties in reading and writing do not justify a conclusion that she had a marked limitation in this domain" and cites, like the ALJ, the Child's grades in those very same special education classes from second grade and one year of third grade.

The ALJ ignored the opinion of the Child's third grade special education teacher who opined that the Child had "serious problems" in expressing ideas in written form and applying problem-

---

[5]The ALJ also mischaracterizes the actual intent of the quoted language from the "Reporting Progress" section of the IEP's "Goals & Objectives" which states: "The student's progress toward annual goals and the extent to which *progress is sufficient to enable the student to achieve the annual goal by the end of the year* will be reported to the student's family by progress report at least as often as that of the general education peers."  R. 174 (emphasis on language quoted by the ALJ).

solving skills in class discussions, and "obvious problems" in comprehending oral instructions, reading and comprehending written material, doing math problems, providing organized oral explanations and adequate descriptions, learning new material, and recalling and applying previously learned material. R. 137. In only two categories did the teacher mark that the Child had a "slight problem" understanding school and content vocabulary and participating in class discussions. R. 137. Although the Commissioner discusses this teacher's opinion (Doc. No. 19 at 12-13), the Commissioner discounts it because the problems were only "obvious" rather than "serious" in six of ten categories; yet the Child had a "serious" problem in two – albeit extremely important – categories, written expression and problem solving. R. 137. Even so, the Commissioner's citation to this teacher's comments from the Child's third grade (unclear if the first or repeated year) performance, was of much less value, compared to specific test results from the Child's fourth grade performance in 2005, just months before the hearing.

The ALJ ignored and did not even mention national standardized testing, the Stanford Achievement Test, administered to the Child in May 2002, at the end of second grade, in which she scored in the lowest one to thirteenth percentile of the children her age in seven of nine categories tested; in the other two categories she scored in the 18th and 29th percentile. R. 153. When the categories were broken down, she scored below average in 36 of the 40 clusters. R. 153. On the Spring 2003 FCAT, which the Child failed, she ranked nationally in the 21st percentile for reading comprehension and the 24th percentile for mathematics problem solving. R. 150. She was a full year behind and retained at that point. R. 165. In a battery of intelligence tests administered to the Child as a kindergartener by Volusia County School Psychologists, the Child was scored as "low average" on an intelligence tests of cognitive skills (Stanford-Binet - R. 230); on a test of her visual perception and motor behavior (Developmental Test of Visual Motor Integration - R. 231) she was placed in the

-10-

"severely deficit range of visual-motor integration."  Most alarming was the test of her short-term memory cluster, which measures the ability to apprehend information, retain awareness of the information, discriminate elements of that information over a short period of time, and then perform a task using the retained information; the Child's score fell in the "severely deficient" range. (Woodcock-Johnson-Revised - R. 232).  The summary by the school psychologist stated:

> At the present time [the Child's] overall level of functioning is within the low average range of intelligence. [The Child's] basic concept development was found to be very delayed based on her age and intellectual ability.  In addition to this, severe processing deficits were revealed in short-term memory and visual integration.

R. 232.  The School District's results were confirmed in 2002 with the testing of the consultative examiner, Rosimeri Clements, Psy. D., who administered an intelligence test to the Child (Wechsler Intelligence Scale - R. 236).  The Child scored "extremely low" in retrieving facts and limited wealth of knowledge; she scored low average in several other areas.  R. 237.  In other testing, her overall academic skills fell within the low average range and correlated to the full-scale intellectual quotient. R. 237.  She was diagnosed with borderline intellectual functioning and mixed receptive-expressive language disorder-provisional; she was assigned a GAF of 50.  R. 238.

The Court finds it was clear error for the ALJ not to properly consider the Child's result on the standardized tests of basic skills.  *See Borgens ex rel. Borgens v. Halter*, 164 F. Supp.2d 1309, 1311 (M.D. Fla. 2001) (holding the ALJ erred in failing to properly consider a child's results on standardized comprehensive test of basic skills, where the ALJ did not make a determination as to the significance of child's obviously low scores which fell in the bottom seventh percentile in math and reading).

Under the social security regulations, "[i]f there is a material inconsistency between your test scores and other information in your case record" the ALJ "will try to resolve it."  20 C.F.R.

§§ 416.926a(e)(4)(iii).  The Regulations require that if an ALJ decides not to rely on test scores[6], then he must explain the reasons for doing so.  20 C.F.R. §§ 416.926a(e)(4)(iii); *see Borgens*, 164 F. Supp.2d at 1312 (remanding case for ALJ to for consideration and explanation of weight given to low standardized test results).  Here, the ALJ chose only selected positive information from the Child's report cards based on her special education classes and completely ignored or disregarded her extremely low scores on intelligence tests, and national, standardized tests as well as other relevant and more indicative records (such as the complete IEP notes) in finding that the Child had "less than marked" limitations in these domains.  Accordingly, the ALJ's decision that the Child had less than marked limitations in acquiring and using information and attending and completing tasks was not based on substantial evidence.

**B.  The Domains of Interacting and Relating With Others and Health and Physical Well Being**

Plaintiff contends the ALJ erred in finding the Child did not have a marked limitation in social functioning (*i.e.*, the domain of interacting and relating to others) because she has paranoid schizophrenia as diagnosed by her treating physicians at ACT Corporation.  The treatment notes indicate the Child was hearing voices, and her impaired mental health would also be a limitation on her health and physical well-being, as discussed by the ALJ, who found the Child did not have any limitation in this domain because medication was helping her.  R. 19.  The Commissioner contends

---

[6]Standard scores on tests (*e.g.*, percentiles) can be converted to standard deviations, which are then used to determine whether a child has a "marked" or "extreme" limitation in a domain.  20 C.F.R. §§ 416.926a(e).  A "marked" limitation is a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain. 20 C.F.R. §§ 416.926a(e).  An "extreme" limitation is a valid score that is three standard deviations or more below the mean, but less than three standard deviations.  20 C.F.R. §§ 416.926a(e).  The Commissioner's argument that the Child "scored better than twenty-one percent of students nationally" (Doc. No. 19 at 13) is meaningless without the mean and standard deviations as points of reference.

the evidence shows the Child did not have a marked or extreme limitation in her ability to interact and relate to others, despite the diagnosis of schizophrenia.  Doc. No. 19 at 16-17.

According to the regulations, for the domain of interacting and relating with others, the ALJ is to examine how well the child can initiate and sustain emotional connections, co-operate, comply with rules, respond to criticism and respect the possessions of others. 20 C.F.R. § 416.926a(i).  For children between six and twelve:

> When you enter school, you should be able to develop lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).  For the domain of health and physical well-being, the ALJ is to examine the cumulative effects of physical and mental impairments and any associated treatments or therapies on the child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects.  20 C.F.R. § 416.926a(l).  Mental disorders may have physical effects that vary in kind and intensity, and make it difficult for a child to perform activities independently or effectively. 20 C.F.R. § 416.926a.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding

an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d at 583 (ALJ properly discounted treating physician's report where the physician's notes indicate he was unsure he could objectively assess claimant's condition).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ found the Child had a less than marked limitations in interacting and relating with others because she related to authority figures and her peers very well, and had no problems with speech or language.  R. 16.  The ALJ believed the Child's testimony over her mother's that she had friends at school and the neighborhood.  R. 17.  Evidence from the Child's teachers was that she got along with her classmates and was obedient at school; her mother testified she was obedient at home.  R. 139, 328.  These particular findings of the ALJ are supported by substantial evidence.

However, the ALJ also dismissively states that the Child only hears voices from "time to time" and never at school, so any limitation in relating to others would be less than marked (R. 17).  He

discusses the Child's mental health in further detail in the domain of health and physical well-being,

stating:

> [H]er medication helps with the voices and she could not remember what they said to her the last time she heard them.  She testified that she did not have any other problems except for the voices.  She testified the voices are always good not bad.
>
> The child has consistently "heard voices" which are a girl's voice and she plays with an imaginary friend.  Her doctor placed her on medication Abilify as a trial in 2003.  The medication seems to be working fine.  The child reported hearing no voices in November 22003.  She made the honor roll in 2004.  The same progress note indicates she was not hearing voices anymore.  She was doing well at home and school.

R. 19.  The Commissioner contends "[r]egardless of the extent to which claimant may have

experienced auditory hallucinations, it clearly had no affect on her ability to interact and relate with

others."  Doc. No. 19 at 18.

The Court is alarmed by both the ALJ's and the Commissioner's cavalier approach to serious

mental illness in this eleven year old girl.  A child hearing voices, whether "from time to time" or on

a regular basis, and whether "good voices" or "bad voices," is a serious mental health issue.  The

ALJ's decision with regard to the Child hearing voices, which he dismissed as a non-marked

limitation in two separate domains, was not based on substantial evidence.

Although the ALJ initially mentioned the Child had received mental health treatment from the

ACT Corporation (R. 13) in the section describing her medical history, the ALJ later omitted any

discussion of treatment records from 2005 in assessing the limitations in the two relevant domains and

cited only to more positive, earlier records.  The ALJ ignored 2005 treatment notes from mental health

providers at the ACT Corporation (submitted at the August 2005 hearing - R. 284) which reflect that

the Child had started hearing voices again in mid-2004 and 2005, and the medication was *not* working

to control them.  R. 286.  In May 2004, her auditory and visual hallucinations had returned, and ACT

treatment notes reflect she was "rocking and mumbling" when seen at the appointment in December

2004.  R. 295 (May 2004); 289 (December 2004).  In May 2004, a provider from ACT completed a Mental Residual functional Capacity Assessment that indicated the Child had marked limitations in the ability to sustain an ordinary routine without special supervision and the ability to interact appropriately with the general public.  R. 298-99.  In January 2005, the Child was again hearing voices and could not be left alone.  R. 286.  She had wet the bed and defecated in it.  R. 287. Dr. Castillo increased the Child's medication.  R. 287.  In April 2005, the Child was reluctant to talk about the voices but admitted she was hearing them.  R. 284.  At the hearing on August 16, 2005, the Child testified that she was still hearing voices every week – "like all month" asking her to play games; the last she had heard was two weeks before the hearing.  R. 342.  The ALJ's findings in the domains of interacting and relating to others and health and well-being, which ignored the Child's true schizophrenic condition in 2004-2005, were not based on substantial evidence.

## IV.  CONCLUSION

For the reasons set forth above, the ALJ's decision is not consistent with the requirements of law and is not supported by substantial evidence.  Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 4, 2008.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

-16-